RECEIVED
USDC. CLERK. CHARLESTON. SC
2012 OCT 18  A 8: 59

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | |
|---|---|
| Reginald Williams, | ) |
| Plaintiff, | ) |
| vs. | ) C/A No.: 2:12-cv-2760-HFF-DCN-RMG |
| South Carolina State Election Commission; Marci Andino, in her capacity as Executive Director of the South Carolina State Election Commission; Charleston County Board of Elections; Joseph L. Debney, in his capacity as Director of the Charleston County Board of Elections; Dorchester County Board of Elections; Joshua Dickard, in his capacity as Director of the Dorchester County Board of Elections; Paul Thurmond; Walter Hundley; Wally Burbage; South Carolina Republican Party; Chad Connolly, in his capacity as Chair of the South Carolina Republican Party; Matt Moore, in his capacity as Executive Director of the South Carolina Republican Party, | ) |
| Defendants. | ) **OPINION AND ORDER** |

Plaintiff, Reginald Williams, filed this action on September 24, 2012, alleging that the State changed its election procedures relating to South Carolina Senate District 41 without first obtaining federal preclearance, as required under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. In his suit, Plaintiff seeks a declaration that these alleged changes in election procedures require preclearance and requests an injunction barring their implementation until

preclearance is secured. (Dkt. No. 12). The injunction he requests would, among other things, prevent Defendant Paul Thurmond or any other person from appearing on the general election ballot as the Republican Party nominee for the District 41 Senate seat, and effectively ensure the election of the Democratic Party nominee by default. (Dkt. No. 13 at 5). Defendants, in turn, oppose Plaintiff's motion for a preliminary injunction and move the Court to dismiss this action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[1] (Dkt. Nos. 18, 19, 33, 34). Plaintiff has filed a memorandum in opposition to Defendants' motions to dismiss and all parties have filed reply briefs. (Dkt. Nos. 35, 40, 41, 42). Pursuant to 28 U.S.C. § 2284, the Chief Judge of the Fourth Circuit designated this three judge panel. (Dkt. No. 11). With the election scheduled to be held on November 6, 2012, the parties and Court finalized an expedited briefing schedule and the Court took evidence and heard oral argument on October 16, 2012. (Dkt. No. 8).

## BACKGROUND

Plaintiff is a resident of the State of South Carolina, an African-American, and a registered voter in District 41. (Dkt. Nos. 12 at 1, 35 at 12 n.9). He asserts two changes in state voting law stemming from the South Carolina Supreme Court's decision in *Tempel v. S.C. Election Comm'n*, __ S.E.2d __, 2012 WL 4320216 (S.C. Sept. 20, 2012). The first change Plaintiff asserts is that, in the *Tempel* decision, the state court "changed the rules for becoming a

---

[1] Rule 12(b)(6) permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." Such a motion tests the legal sufficiency of the complaint, limiting our inquiry "to whether the allegations constitute a short and plain statement of the claim showing that the pleader is entitled to relief." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (quotation marks and citations omitted).

political party nominee" when it allowed the disqualification of a party nominee who had initially failed to properly file for candidacy. (Dkt. No. 12 at 3). The second alleged change is that, as a consequence of *Tempel*, the state Election Commission did not adhere to a requirement that, at least forty-five days prior to a primary or election, it transmit ballots to absentee voters who meet the qualifications set forth in the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 42 U.S.C. §§ 1973ff *et seq. See* S.C. Code §§ 7-15-405, 7-15-406, 7-15-460 (implementing UOCAVA, which applies to federal elections, and extending its requirements to local and state elections as well); *see also Somers v. S.C. Election Comm'n*, __ F. Supp. 2d __, 2012 WL 1754094, at *2 n.6 (D.S.C. May 16, 2012).

## A. Nominee Disqualification under *Tempel*

The changes asserted by Plaintiff arise out of a series of decisions issued by the South Carolina Supreme Court this year: *Anderson v. S.C. Election Comm'n*, 725 S.E.2d 704 (S.C. 2012); *Florence Cnty. Democratic Party v. Florence Cnty. Republican Party*, 727 S.E.2d 418 (S.C. 2012); and *Tempel*, 2012 WL 4320216.

In *Anderson*, the South Carolina Supreme Court interpreted S.C. Code § 8-13-1356(B) to require that any candidate for office file a paper copy of his statement of economic interests at the same time and with the same official that he files his declaration of candidacy.[2] *See Anderson*, 725 S.E.2d at 707-08. As a result of that decision, a large number of candidates were removed from the primary ballot in early May. *See id.* at 708. The following month, in *Florence County*, the state Supreme Court reaffirmed its decision in *Anderson. See Florence Cnty.*, 727 S.E.2d at

---

[2] Section 8-13-1356(B) reads: "A candidate must file a statement of economic interests for the preceding calendar year at the same time and with the same official with whom the candidate files a declaration of candidacy or petition for nomination."

-3-

421.[3]

It was against the backdrop of the South Carolina Supreme Court's decisions in *Anderson* and *Florence County* that the *Tempel* case was brought to challenge the inclusion of Defendant Thurmond on the ballot as the Republican Party nominee for Senate District 41. Defendant Thurmond, like many others, failed to meet the § 8-13-1356(B) filing requirement. But, while other candidates (including those opposing Thurmond for the party nomination) had been decertified following *Anderson* and *Florence County*, the fact that Thurmond had improperly filed for candidacy was only determined after Thurmond had run unopposed in the primary and been certified as his party's nominee. On the basis of Thurmond's improper filing, the plaintiff in *Tempel* sought to have Thurmond removed from the general election ballot.

Addressing this set of issues once again, the Supreme Court in *Tempel* found that Defendant Thurmond was subject to the filing requirements of § 8-13-1356(B), and that he "did not file a paper copy of his [statement of economic interests] along with his [declaration of candidacy] as required by section 8-13-1356(B), and interpreted" in *Anderson* and *Florence County*. 2012 WL 4320216, at *1. Nevertheless, the Supreme Court concluded that "[t]he fact that the Republican Party in good faith, albeit erroneously, believed Thurmond was exempt from the filing requirement of section 8-13-1356(B) does not negate his status as the party nominee." *Id.* at *2.

Proceeding from the premise that Thurmond was the party's nominee, the South Carolina Supreme Court looked to S.C. Code § 7-11-55, the provision that provides for substitution of

---

[3] *See Smith v. S.C. Election Comm'n*, __ F. Supp. 2d __, 2012 WL 2311839, at *1-4 (D.S.C. June 18, 2012) (summarizing more fully the *Anderson* and *Florence County* decisions).

-4-

party nominees, to determine "what South Carolina's election law regime provides to political parties, candidates, and citizens upon the disqualification or resignation of a party nominee." *Id.* at *3.[4] The South Carolina Supreme Court, construing the text of S.C. Code § 7-11-55 for what appears to have been the first time, analyzed the provision so as to "ascertain and give effect to the intent of the legislature." *Id.* at *4. The Supreme Court observed that "[i]t is clear from the face of the statute that the General Assembly intended to provide a mechanism for political parties to replace nominees prior to the general election," and found it equally clear that the legislature did not intend to prevent a political party "from conducting *any* special primary to replace its nominee due to an improper certification of a nominee." *Id.* A finding to the contrary, the Supreme Court noted, would produce "the absurd result that a political party can never conduct a replacement primary in a circumstance where, as here, its candidate is disqualified after certification for a defective filing." *Id.* at *3. In light of this analysis, the South Carolina Supreme Court concluded that Thurmond was disqualified as a candidate for failure to adhere to the requirements of S.C. Code § 8-13-1356, that this disqualification occurred after he had become the nominee of his party, and that the Republican Party thus had the authority under S.C. Code § 7-11-55 to conduct a special primary to place a qualified candidate on the general election ballot. *Id.* at *4.

The Supreme Court thus affirmed the lower court's order permitting a special primary to be held on September 18, 2012. Subsequently, Thurmond and two other candidates timely and lawfully filed as candidates in the special primary. Thurmond ultimately won a run off special

---

[4] Section 7-11-55 provides: "If a party nominee dies, becomes disqualified after his nomination, or resigns his candidacy for a legitimate nonpolitical reason . . . and was selected through a party primary election, the vacancy must be filled in a special primary election."

primary on October 2, 2012, and was certified as the Republican nominee for Senate District 41.

### B. UOCAVA Ballot Transmission

Under the statutory scheme adopted by South Carolina for the transmission of absentee ballots to uniformed and overseas voters (hereafter referred to as "UOCAVA" ballots and voters), such ballots are to be available for distribution at least forty-five days before any primary or election. *See* S.C. Code §§ 7-15-405(A), 7-15-406. As a result of the conducting of the special primary and run off authorized by S.C. Code § 7-11-55 and permitted by the South Carolina Supreme Court's decision in *Tempel*, adherence to the statutorily-mandated absentee ballot schedule became impossible.[5]

Subsequent to the South Carolina Supreme Court's decision in *Tempel*, the county election commissions responsible for conducting the Senate District 41 general election distributed ballots to UOCAVA-qualifying voters on September 21, 2012, in compliance with the forty-five day deadline. (Dkt. Nos. 40-3 at 23, 40-4 at 13). These UOCAVA ballots showed all federal and state races except the Senate District 41 race, and informed the UOCAVA voters that a supplemental ballot would be distributed to them for the Senate District 41 contest as soon as

---

[5] A similar situation arose during other primaries held earlier this year because, upon agreeing to hear the *Anderson* case, the South Carolina Supreme Court issued an injunction barring the distribution of ballots regarding the affected races "until further orders of the Court." *Somers*, 2012 WL 1754094, at *1 (quoting the state court injunction). As a result of that injunction, the South Carolina Election Commission directed county election commissions to transmit UOCAVA ballots for any federal primaries but not to include state races, since the state primary races could potentially be "affected" by *Anderson*. UOCAVA ballots for state races were sent out after the *Anderson* decision was issued and the injunction lifted on May 2, 2012, fewer than forty-five days before the June 12 primary. *Id.* at *2. The State of South Carolina asked the United States Department of Justice to preclear this method of distributing two sets of ballots to UOCAVA voters following *Anderson*, and on June 29, 2012, the Department of Justice informed the State that it would interpose no objection to that change in election procedure. (Dkt. No. 12-7).

the special primary results were determined. (Dkt. No. 40-3 at 51). On October 8, 2012, shortly after the run off special primary was completed and Thurmond was certified as the Republican Party nominee, the supplemental UOCAVA ballots containing the Democratic and Republican candidates for Senate District 41 were transmitted to UOCAVA voters. This transmission occurred after the forty-five day deadline set forth under state law and, according to Charleston and Dorchester County election officials responsible for conducting the Senate District 41 election, represented a departure from the provisions of S.C. Code § 7-15-406 for the distribution of UOCAVA ballots.[6]

## LEGAL STANDARD

Section 5 of the Voting Rights Act requires certain covered jurisdictions, including South Carolina, to obtain federal judicial or administrative preclearance "[w]henever" they "enact or seek to administer any" change affecting voting. 42 U.S.C. § 1973c(a). This requirement is "expansive within its sphere of operation" and "comprehends *all* changes to rules governing voting." *Presley v. Etowah Cnty. Comm'n*, 502 U.S. 491, 501 (1992) (emphasis added); *see also Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009) (stating that Section 5 suspends "*all* changes to state election law—however innocuous—until they have been precleared by federal authorities"). It does not matter "whether the change works in favor of, works against, or is neutral in its impact upon the ability of minorities to vote. It is change that invokes the preclearance process." *Young v. Fordice*, 520 U.S. 273, 285 (1997).

In *Riley v. Kennedy*, 553 U.S. 406 (2008), the Supreme Court summarized the inquiry

---

[6] In their hearing testimony, the Directors of the Boards of Elections for Charleston and Dorchester counties informed the Court that a total of 193 UOCAVA ballots had, at the time of the hearing, been transmitted to eligible voters in District 41.

necessary to determine if a "change" has occurred:

> In order to determine whether an election practice constitutes a "change" as that term is defined in . . . § 5 precedents, we compare the practice with the covered jurisdiction's "baseline." We have defined the baseline as the most recent practice that was both precleared and in force and effect . . . . The question is whether a State has enacted or is seeking to administer a practice or procedure that is different enough from the baseline to qualify as a change.

*Id.* at 421.

It is well settled that a state judicial decision that results in a change in a state election procedure is subject to Section 5 preclearance. *See Hathorn v. Lovorn*, 457 U.S. 255, 265 n.16 (1982); *see also LULAC of Tx. v. Texas*, 995 F. Supp. 719, 725 (W.D. Tex. 1998); 28 C.F.R. § 51.12. This does not mean, however, that every construction or application of a precleared election law by a state court requires a submission to the United States Department of Justice under Section 5. *See, e.g., Smith v. S.C. Election Comm'n*, __ F. Supp. 2d __, 2012 WL 2311839, at *8-9 (D.S.C. June 18, 2012). Only a state judicial decision which results in a change to election procedures is subject to preclearance under Section 5.

A three judge district court facing a Section 5 challenge has only a limited role in this process. It "lacks authority to consider the discriminatory purpose of nature of the changes," since the statute defines the exclusive avenues for obtaining preclearance review. *Lopez v. Monterey Cnty.*, 519 U.S. 9, 23 (1996). Instead, the three judge court "may determine only whether Section 5 covers a contested change, whether Section 5's approval requirements were satisfied, and if the requirements were not satisfied, what temporary remedy, if any, is appropriate." *Id.*; *see Somers*, 2012 WL 1754094, at *4 (applying this standard); *Smith*, 2012 WL 2311839, at *7 (same); *see also United States v. Louisiana*, 952 F. Supp. 2d 1151, 1159-63

(W.D. La. 1997) (explaining why this standard, rather than the traditional four-part test for determining whether to issue a preliminary injunction, applies in this context).

In determining whether a contested change is covered by Section 5, the court must accord the Voting Rights Act the "broadest possible scope," ensuring that preclearance is obtained for changes that affect voting even in a "minor way," *Allen v. State Bd. of Elections*, 393 U.S. 544, 566-67 (1969), and even those that merely have a "potential for discrimination," *NAACP v. Hampton Cnty. Election Comm'n*, 470 U.S. 166, 181 (1985). The court's goal is thus simply "to ensure that the covered jurisdiction submits its election plan to the appropriate authorities for preclearance as expeditiously as possible." *Lopez*, 519 U.S. at 24.

Though the court's review is limited under this standard, it nevertheless "always has to consider its own jurisdiction to address the controversy in the first place," including threshold justiciability issues such as standing and ripeness. *Little v. Strange*, 796 F. Supp. 2d 1314, 1335 (M.D. Ala. 2011) (concluding "that Plaintiff has not shown an injury in fact necessary to achieve Article III standing in this § 5 suit to obtain injunctive relief against enforcement of the" state statute); *see also Somers*, 2012 WL 1754094, at *4 ("Before exercising jurisdiction over this [Section 5] matter, the court must assure itself that the action satisfies Article III's case or controversy requirements.").

## DISCUSSION

Plaintiff asserts that two voting "changes" resulted from *Tempel*—namely, a change in the procedure for becoming a political party's nominee and a change in the procedure for transmitting UOCAVA ballots. Based on that assertion, he argues that preclearance is required. The Court will address separately each of these alleged changes in state voting law.

### A. *Tempel v. South Carolina Election Commission*

Plaintiff first alleges that the South Carolina Supreme Court, through its *Tempel* decision, "changed the rules for becoming a political party nominee" when it interpreted state law to allow for the disqualification of a party nominee who had initially failed to properly file for candidacy. (Dkt. No. 12 at 3). As discussed earlier, Section 5 preclearance is necessary only where the challenged action represents a change in election procedures. *See Young,* 520 U.S. at 285 ("It is change that invokes the preclearance process."). Plaintiff fails to establish a "change" that would trigger Section 5 preclearance.

Plaintiff alleges that, in *Tempel*, the South Carolina Supreme Court adopted "a novel procedure by which a candidate may become a political party's nominee." (Dkt. No. 12 at 3). Specifically, Plaintiff argues that *Tempel* permits a political party to confer its nomination based on its "good faith" determination of a candidate's compliance with the filing requirements of § 8-13-1356(B) as interpreted in *Anderson*, regardless of whether the candidate actually complied those requirements. He further contends that this "good faith nomination" procedure represents a departure from the baseline practice as it stood before *Tempel*. (Dkt. No. 12 at 3). But Plaintiff incorrectly identifies the "baseline"—"the most recent practice that was both precleared and in force and effect," and the standard against which post-*Tempel* election procedure should be compared to determine whether a change has occurred. *See Riley,* 553 U.S. at 421.

To identify the correct baseline, it is important to understand what the South Carolina Supreme Court did in *Tempel*, and what it did not do. The *Tempel* case presented an extremely unusual—possibly unique—set of circumstances. Given that, it should come as no surprise that the *Tempel* decision addressed an equally narrow legal issue: what happens when a party

-10-

nominee is discovered not to have properly filed for candidacy. Faced with that question, the South Carolina Supreme Court decided that, once a candidate becomes a party's nominee, the provision of state law governing nominees applies, rather than the provision governing candidates. *See Tempel*, 2012 WL 4320216, at *3. From there, the South Carolina Supreme Court applied statutory construction techniques to the provision pertaining to nominee disqualification, S.C. Code § 7-11-55, all the while seeking to "ascertain and give effect to the intent of the legislature." *Id.* at *4.

Plaintiff contends that an individual who never properly filed for candidacy cannot have become the party's nominee. (Dkt. No. 12). Two justices who dissented in *Tempel* would appear to agree with Plaintiff. *See id.* at *4 (Pleicones, J., dissenting). But mere disagreement with a state court's construction of a previously precleared election law does not require a federal court to order preclearance under Section 5. *See Young*, 520 U.S. at 285 ("It is change that invokes the preclearance process.").

To establish the necessity for preclearance of an election law change under Section 5, Plaintiff must demonstrate a departure or change from the State's baseline practice. Plaintiff fails to do this. He offers no evidence that, prior to *Tempel*, the State's practice—that is, its treatment of party nominees who did not properly file for candidacy—was any different than it is after *Tempel*. Nor does Plaintiff offer any persuasive evidence that the Department of Justice, in granting preclearance to § 8-13-1356 or to § 7-11-55, understood the relationship between the candidate filing provision and the nominee disqualification provision to be any different than how it was set forth by a majority of the South Carolina Supreme Court in *Tempel*. Without establishing a baseline that is any different than the statutory construction provided by the

*Tempel* court, Plaintiff does not meet his burden of demonstrating a change in a voting practice or procedure.

Another three judge court, convened this year to address a claim that the South Carolina Supreme Court decisions in *Anderson* and *Florence County* required Section 5 preclearance, reached a similar conclusion. *See Smith*, 2012 WL 2311839, at *10. The plaintiffs in *Smith* argued that the requirement that a candidate must file a paper copy of his statement of economic interests and the statement of candidacy at the same time with the same election official represented a change in election procedure that required Section 5 preclearance. The *Smith* court found that "[t]he only evidence of the baseline is [the statute] itself." *Id.* at *9-10. The court went on to explain that the South Carolina Supreme Court in *Anderson* was merely interpreting "the plain language" of the statute and that such construction does "not constitute[] a change in law or practice requiring preclearance." *Id.* at 10; *see also Smith v. S.C. Election Comm'n*, __ F. Supp. 2d __, 2012 WL 4741636, at *5-6 (D.S.C. Oct. 3, 2012) (reaffirming that conclusion).

Similarly, in this case where both parties agree that the portion of § 7-11-55 relating to nominee disqualification has not previously been applied, the only evidence of the baseline practice on that point is the language of § 7-11-55 itself. *See Smith*, 2012 WL 2311839, at *10. This Court concludes that the South Carolina Supreme Court's interpretation of that text in *Tempel* does not represent a change triggering Section 5 preclearance. *Cf. LULAC of Tx.*, 995 F. Supp. at 725 (stating, in concluding an electoral change had occurred as a result of a judicial decision striking down a portion of a precleared statute on state constitutional grounds, that "this is not simply a case of a state court interpreting an already precleared statute").

Since Plaintiff has failed to demonstrate a change from the State's baseline practice, he is

unable to establish an essential element of his Section 5 claim and a critical requirement for preliminary injunctive relief. Consequently, Plaintiff's motion for a preliminary injunction on the claim that the South Carolina Supreme Court's decision in *Tempel* required Section 5 preclearance is denied and Defendants' motions to dismiss this claim are granted.[7]

## B. UOCAVA Ballots

The second change asserted by Plaintiff is that "*Tempel* . . . changes the benchmark procedure by ordering a special primary election that did not mail absentee ballots to uniformed service members 45 days prior to the election, as required by S.C. Code § 7-15-405," (Dkt. Nos. 12 at 24, 40 at 4-9), and that "*Tempel* has also changed the benchmark procedure for the 2012 general election since general election absentee ballots were required to be mailed on or about September 21, 2012." (Dkt. No. 1 at 17). In other words, Plaintiff claims that, as a result of the State's efforts to comply with *Tempel*, the state Election Commission did not adhere to a statutory requirement that, at least forty-five days prior to a primary or general election, it must

---

[7] Plaintiff makes much of the fact that, subsequent to the filing of this lawsuit, the South Carolina Attorney General submitted a preclearance letter to the United States Department of Justice regarding the *Tempel* decision. (Dkt. No. 40-1). Plaintiff argues the submission is a "tacit admission" that preclearance is required. (Dkt. No. 40 at 2). A review of the submission letter indicates that it was submitted "out of an abundance of caution" and at the formal request of another public official. (Dkt. No. 40 at 1). The submission states that it is the view of the South Carolina Attorney General that the South Carolina Supreme Court's decision in *Tempel* does not qualify as a change under Section 5 requiring preclearance because it involves "traditional statutory interpretation of the kind routinely handled by state courts around the country." (Dkt. No. 40 at 1-2). The testimony of J. C. Nicholson, the Assistant Attorney General in charge of Section 5 compliance, confirmed that this remains the view of the South Carolina Attorney General. Also, on October 12, 2012, the State requested expedited preclearance review of the method of distributing a separate ballot for the Senate District 41 race. (Trial Exh. EE). The Court views these preclearance submissions as prudent responses by the South Carolina Attorney General to this litigation and does not find that they weigh either for or against the legal question of whether the *Tempel* decision or alleged consequent changes to UOCAVA ballot distribution requires Section 5 preclearance.

mail ballots to absentee voters who meet the qualifications set forth in UOCAVA, 42 U.S.C. §§ 1973ff *et seq.* *See* S.C. Code §§ 7-15-405, 7-15-406, 7-15-460; *see also Somers*, 2012 WL 1754094, at *2 n.6 (describing this requirement).

Defendants argue that Plaintiff lacks standing to bring claims relating to defective UOCAVA ballots. (Dkt. No. 19 at 7, Dkt. No. 33 at 15-16, Dkt. No. 34 at 6). Of course, even if Defendants had not broached this issue, this Court "always has to consider its own jurisdiction to address the controversy." *Little*, 796 F. Supp. 2d at 1322.

To establish standing, (1) a plaintiff must have suffered an "injury in fact," which is an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent," not conjectural or hypothetical; (2) the injury must have been caused by the defendant's complained-of actions; and (3) a plaintiff's injury or threat of injury must likely be redressable by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992); *see also Somers*, 2012 WL 1754094, at *4 n.11 (noting, in a Section 5 case, that under *Lujan* "the injury must affect the plaintiff in a personal and individual way").

In responding to the argument that he lacks standing, Plaintiff emphasizes that, in *Allen*, the Supreme Court analyzed a private litigant's right to bring suit under Section 5 and observed that it was "consistent with the broad purpose of the [Voting Rights Act]" to grant "the individual citizen standing to insure that his city or county government complies with § 5 requirements." 393 U.S. at 557. This line of argument is correct, as far as it goes. But nothing in *Allen* or other Section 5 precedent "establishes or suggests that a private litigant may bring a Section 5 suit without a concomitant showing of an Article III injury in fact." *Little*, 796 F. Supp. 2d at 1327. Nor could it. *See Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) ("Congress

cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."). In other words, Plaintiff still must show an injury in fact.

Plaintiff has failed to meet this threshold justiciability requirement. Plaintiff has not even suggested that the contested change in voting procedure may affect him personally by, for instance, diluting his vote, preventing him from casting his ballot, or nullifying his ability to elect the candidate of his choice. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 205 (1996). It is also clear from his testimony that Plaintiff is neither a UOCAVA voter himself, nor is he claiming third party standing to assert the rights of UOCAVA voters. Indeed, beyond his general assertion that *Allen* confers standing on him as a private citizen and registered voter who is concerned about the integrity of the election in his district, Plaintiff fails to allege any concrete and particularized injury at all. *See Lujan*, 504 U.S. at 560 n.1. As a result, the Court concludes that he lacks standing to bring this Section 5 claim.

## CONCLUSION

Based upon the foregoing, Plaintiff's motion for preliminary injunction is denied, (Dkt. No. 13), and Defendants' motions to dismiss, (Dkt. Nos. 18, 19), are granted. Since Plaintiff's claim based upon the alleged UOCAVA-related election law changes is dismissed for lack of standing based upon the factual record now before the Court, rather than on the merits of the underlying Section 5 claim, the dismissal of this claim is without prejudice.

AND IT IS SO ORDERED.

s/ Henry Franklin Floyd
Henry Franklin Floyd
United States Circuit Judge

s/ David C. Norton
David C. Norton
United States District Judge

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

Charleston, South Carolina
October 18, 2012